## Case No. 14,400.

UNION TOW-BOAT CO. v. The DELPHOS.

[Newb. 412.] [1]

District Court, E. D. Louisiana. Nov., 1849.

SALVAGE—SURRENDER OR CONTROL—SUPERFLUOUS SERVICES—SPECULATIVE DANGER— SALVAGE SERVICES.

1. In a case of salvage, it is immaterial whether the master of the vessel requiring assistance formally surrenders the vessel into the hands of the salvors or not, if it appear that he called for assistance, and that neither he nor his crew actively participated in the salvage service. Their presence, merely, cannot be permitted to detract from the meritorious character of the services performed by the salvors.

2. The aid rendered to a burning vessel by tow-boats whose services were not actually required to rescue the vessel from her perilous situation, will be regarded as superfluous. And the court, in estimating the value of the tow-boats employed in the salvage service, will look to the evidence to ascertain how many were really necessary for the accomplishment of the object in view, and treat all others as supernumeraries, which being in sight of the burning vessel, rendered assistance not actually required.

3. While such assistance is not to be deprecated by the court, it cannot be received as a reason for increasing the estimate of the property put at risk, and thereby enhancing the claim of the owners for salvage compensation.

4. A tow-boat company cannot be treated as a salvor, but as the owner of property (their tow-boats), which is put at risk in the salvage service, are to be compensated like all other owners of vessels under similar circumstances.

5. Salvage is not always a mere compensation for work and labor. Various considerations: the interests of commerce and navigation, the lives of the seamen, render it proper to estimate a salvage reward upon a more enlarged and liberal scale.

6. The ingredients of salvage are: First. Enterprise in the salvors in going out in tempestuous weather to assist a vessel in distress, risking their own lives to save their fellow creatures, and to rescue the property of their fellow citizens. Secondly. The degree of danger and distress from which the property is rescued, whether it was in imminent peril and almost certainly lost, if not at the time rescued and preserved. Lastly. The value of the property saved. When all these circumstances concur, a large and liberal reward ought to be given; but where none, or scarcely any take place, the compensation can hardly be denominated a salvage compensation. It is little more than a mere remuneration pro opera et labore. Sir John Nicholl, in the case of The Clifton, 3 Hagg. Adm. 117.

7. Mere speculative danger will not be sufficient to entitle a person to salvage: but the danger need not be such that escape from it by other means was impossible. It cannot be necessary that the loss should be inevitably certain; but it is necessary that the danger should be real and imminent. Talbot v. Seeman, 1 Cranch [5 U. S.] 1.

---

[1] [Reported by John S. Newberry, Esq.]

8. It is rare that we find combined in a single case all the ingredients of a salvage service; but we must not, therefore, lose sight of those which prominently appear, from the evidence, to command our approval or elicit our commendation.

In admiralty.

Cohen & Labott and Winthrop & Roselius, for libelants.

Hunton & Bradford, for respondents.

McCALEB, District Judge. The libel in this case was filed on behalf of the Union Tow-Boat Company, a limited copartnership established by an act of the legislature of Louisiana, approved the 13th of March, 1837, for the purpose of towing vessels by steam in and out to sea, and up and down the Mississippi river, and also lightening vessels in said river, or at sea, and carrying freight and passengers in the Gulf of Mexico, and elsewhere at sea. A claim for salvage has been set up by the company against the bark Delphos, for the reasons which will appear from the following facts substantially proven by the witnesses examined on the trial of the cause. On Thursday, the 3d of May last, at about 9 o'clock in the morning, while the tow-boat Conqueror, belonging to the libelants, was towing the bark in question from inside the bar of the South West pass to sea, the latter was discovered to be on fire in the hold. By order of Captain Crowell, master of the bark, her head was immediately turned up stream; but, as the vessels were then in shoal water, it was found necessary to have the aid of another tow-boat, and the Ocean, also belonging to the libelants, was by a signal, summoned to the assistance of the Conqueror. Thus, by the co-operation of both tow-boats, the Delphos was carried back to an anchorage, under the direction of the branch pilot, in whose charge she was proceeding to sea when the fire was discovered. Captain Crowell being anxious to extinguish the flames without any other assistance than such as could be derived from his own officers and crew, immediately commenced searching for the fire under the main hatches and the cabin floor, but soon found it necessary to put the hatches on again. He continued his exertions to extinguish the flames by pouring water through the deck and cabin floor; but without producing any favorable result. Finding it impossible to subdue the flames, which were, indeed, every moment increasing, he called upon Captain Snow, the master of the tow-boat Conqueror, to save the bark if he could. It may be proper to add that he intimated, when he commenced his exertions with the means at his own disposal, he should ask assistance if those means should prove insufficient. The hose and pump of the Conqueror had been placed at his disposal, but he had used them without producing the desired effect. As soon as Captain Snow was authorized to undertake the rescue of the bark from the danger,

which the evidence shows was imminent, he immediately set to work with the crews of the Conqueror and Ocean, and all the pumps that could be brought into use. At this time the fire was increasing rapidly; and it was the unanimous opinion of all present, that the only effectual mode of saving the vessel that could be resorted to, under the circumstances, was to scuttle her, and let her sink to the deck. It was the opinion of several persons present, that there was not water sufficient to cover her; but as there was no time to remove her into deeper water, she was scuttled without delay and on the spot where she was then anchored. The deck and cabin floor were at the same time kept covered with water. As the bark took the mud on the bottom she settled very slowly. About sunset the tow-boat Hercules, also belonging to the libelants, came alongside and assisted with her pumps. From this time until 3 o'clock next morning, it required the most active exertions of not only the crews of the Conqueror, the Ocean and the Hercules, but also of the tow-boats Star and Claiborne (also belonging to the libelants), to keep the fire from breaking out. After 3 o'clock, the flames were so far subdued that the pumps of the steamer were worked only occasionally during that and the next day. At 7 o'clock on Friday morning the steam pumps belonging to the Star, of peculiar construction and extraordinary power, commenced working, and by 6 o'clock in the afternoon had succeeded in freeing the bark of water. Although she had both anchors out, there was a constant tendency of the bow of the bark down stream, because of the great weight of the water in the stern, and it was therefore found necessary to keep the tow-boat Ocean alongside the greater part of the day. On Friday evening after the water was pumped out, the bark was got under way and towed into deep water off the pilot's station, by the Ocean and Star, which remained alongside all night. On Saturday morning at about 9 o'clock, the Star started to the city with the bark and a small brig in tow, and arrived about 4 o'clock in the afternoon on Sunday. She remained alongside all night. On Monday morning there was considerable water found in the hold of the bark. This was removed by the steam pumps belonging to the Star, and by 12 o'clock the bark was left in safety alongside the levee.

The facts of the case as thus far stated, are substantially contained in the statement of facts, signed by Capt. Crowell of the bark and Capt. Snow of the Conqueror, and afterwards submitted to arbitrators appointed by the parties. They are mainly confirmed by the testimony of witnesses, and especially by that of Capt. Snow, who was sworn and examined before the court. Capt. Crowell was also examined as a witness under a commission, and denies that he called upon Capt. Snow to save the bark if he

could, and declares that he objected to that particular part of the statement of facts after the claim of salvage was submitted to arbitrators, but before the award. Whether he said what is there stated be correct or not, is not material, when we consider what actually occurred. Whether he formally surrendered the vessel into the hands of the salvors or not, it is clear that he called for assistance, and it does not appear that either he or any portion of his crew, actively participated in the salvage service after Capt. Snow commenced operations. It is, however, proper here for me to remark that there was not what is usually denominated in admiralty law an abandonment of the vessel. The master and crew did not leave her cum animo non revertendi. This is then not properly a case of derelict in the sense of the maritime law. The master and crew of the bark were present while the salvage services were performed. But it is difficult to perceive wherein their presence merely can detract from the really meritorious character of the services performed by the salvors. According to the testimony of Mr. Park, the pilot at the South West pass, if assistance had not been rendered by the tow-boats, the bark would have been a total loss in three hours. The timbers were burnt and the mizzen-mast was on fire. The peril to which she was exposed was most imminent; and it is clear that she was rescued only by the timely assistance of the tow-boats. The evidence shows that there was great energy, promptitude and skill on the part of the salvors. The bark was so scuttled as to enable them to free her of the water when the flames were subdued; and this last important service was performed by the application of the powerful steam pump on board the tow-boat Star. It is proven by the testimony of Capt. Whitney of the Hercules, that the bark could not, without this machinery, have been raised. The persons engaged in giving assistance were almost constantly in the water, and greatly annoyed by the smoke from the burning cotton. I certainly cannot agree with the proctors of the claimants, when they contend that there was no risk of life and property incurred by the salvors. It is almost impossible to imagine the close proximity of human beings and of property like those tow-boats, to a vessel with a cargo of cotton on fire in her hold, without feeling a strong conviction that there must be danger. There would be danger from the sudden bursting up of the deck, which may naturally occur from the pressure of the intense heat produced by such a combustible as cotton in the pent up hold of a vessel; and there would be danger from the sudden breaking forth of the flames consequent upon such an explosion. The salvage services commenced at 9 o'clock on Thursday when the Ocean was summoned to aid in towing the bark to an anchorage, and continued until 12 o'clock on Monday following, when she was finally left in safety at the levee. For about twelve hours only of the time here mentioned, however, were the salvors laboriously and energetically employed. During the balance of the time, not much more than ordinary vigilance and care were necessary to preserve the vessel and bring her to this port. I cannot assent to the ground taken by the proctors for the libelants, that the co-operation of all the tow-boats was required to save the vessel and cargo. This co-operation may be magnified into importance for the purpose of swelling the claim for salvage compensation by showing the great value of the property employed and put at risk in the salvage service. The co-operation of the Ocean with the Conqueror, I consider was indispensably necessary, to get the bark back to her anchorage; and it is quite clear that without the aid of the extraordinary pump on board of the Star, it would have been impossible to relieve the vessel of water after the flames were subdued by scuttling. The aid of the Hercules and Claiborne must therefore be regarded, to a great extent at least, as superfluous. They stand rather in the light of supernumeraries, which being in sight of the burning vessel offered and rendered assistance, which was not really demanded for the safety of the bark and cargo; and while such assistance is by no means to be deprecated by the court, it cannot be received as the basis for increasing the estimate of the value of the property put at risk and thereby enhancing the claim of the owners. Having reviewed as minutely as I deem necessary, the main facts of the case, I shall now present the law which must govern me in awarding compensation. And here, I am sorry to say, that the view which I feel bound to take of the case, differs widely from the positions assumed by the proctors of both libelants and claimants. While I am disposed to regard the services of the salvors as highly meritorious, it is yet clear that there is nothing in the record to show that there is a single salvor before the court claiming compensation for those services.

The libel sets forth the claim of the Union Tow-Boat Company, and makes no mention whatever of the names or claims of the individuals who actively participated in the salvage service. There is no allegation and no proof that any of the salvors were even members of or stockholders in the corporation, which alone appears as libelant in the cause; and even if such allegation and proof appeared of record, the salvor who thus appeared to be member or stockholder, would not be allowed a compensation in the former character, unless his rights were distinctly asserted as such. His claim would otherwise be merged in that of the corporation as owner of the property employed and put at risk in the salvage service. To regard this corporation as a salvor and award it compensation as such, would in my opinion be

contrary to all the well established principles of admiralty law regulating the action of courts in cases of this nature. It is doubtless entitled to a liberal reward for the employment and risk of its property, but this reward must be fixed in accordance with the usual mode of distributing the whole amount of salvage compensation. Such was the course pursued by this court in the case of The Charles. In that as in this case, the actual salvors set up no claim for compensation, and it was contended by the proctors for the libelants, who were the owners of the tow-boat employed in the salvage service, that all the rights of the captain and crew of the tow-boat when not formally asserted by themselves, necessarily accrued to the owners. This principle was distinctly repudiated by the court, upon the ground that owners were usually allowed a certain proportion of the whole quantum of compensation awarded, and they had no right to claim that proportion which was exclusively due to the actual salvors if they had chosen to demand it. And the court declared that to act upon any other principle would be to award to cupidity that portion which modesty had declined receiving. The case was considered as if all the salvors had been before the court, a fair aggregate compensation was fixed, and of that compensation the proportion of one-third was awarded to the owners of the tow-boat. The course pointed out by the case here cited, is the only one which can be safely and legitimately pursued in the case now under consideration. It is moreover the only course which can be adopted to secure uniformity in judicial decisions in cases which are confided by the law to the sound discretion of the court.

Let us proceed, then, to inquire what would be a fair salvage compensation if the actual salvors were before the court. And here I cannot assent to the position of the proctor for claimants, that the rates of towage usually charged by tow-boats can form even a basis upon which the court shall estimate the value of the services of the salvors themselves, or of the boats by means of which they were mainly enabled to perform those services. "Salvage," says Sir John Nicholl, in the case of The Clifton, 3 Hagg. Adm. 117, "is not always a mere compensation for work and labor; various considerations, the interests of commerce, the benefit and security of navigation, the lives of the seamen, render it proper to estimate a salvage reward upon a more enlarged and liberal scale. The ingredients of salvage are: First, enterprise in the salvors in going out in tempestuous weather to assist a vessel in distress, risking their own lives to save their fellow creatures and to rescue the property of their fellow subjects. Secondly, the degree of danger and distress from which the property is rescued, whether it was in imminent peril and almost certainly lost if not at the time rescued and preserved. Thirdly, the degree

of labor and skill which the salvors incur and display, and the time occupied. Lastly, the value of the property saved. Where all these circumstances concur, a large and liberal reward ought to be given; but where none or scarcely any take place, the compensation can hardly be denominated a salvage compensation. It is little more than a mere remuneration pro opera et labore."

In regard to the degree of peril in which the property should be to authorize a claim for salvage compensation, I shall content myself with referring to the decision of the supreme court of the United States, delivered by Chief Justice Marshall, in the case of Talbot v. Seeman, 1 Cranch [5 U. S.] 1. In that case it was urged in argument, that to maintain the right to salvage, the danger ought not to be merely speculative, but must be imminent and the loss certain. In reply to this position, the chief justice said: "That a mere speculative danger will not be sufficient to entitle a person to salvage, is unquestionably true. But that the danger must be such that escape from it by other means was impossible, cannot be admitted. In all the cases stated, safety by other means was possible, though not probable. The flames of a ship on fire might be extinguished by the crew or by a sudden tempest. A ship on the rocks might possibly be got off by the aid of wind and tides without assistance from others. A vessel captured by an enemy might be separated from her captor, and if sailors had been placed on board the prize, a thousand accidents might possibly destroy them; or they might even be blown into a port of the country to which the prize vessel originally belonged. It cannot therefore be necessary that the loss should be inevitably certain; but it is necessary that the danger should be real and imminent." Another principle by which courts of admiralty are governed and which leads to a liberal remuneration in salvage cases, is not to look merely to the exact quantum of service performed in the case itself, but to the general interests of navigation and commerce. The fatigue, the anxiety, the determination to encounter danger, the spirit of adventure, the skill and dexterity which are acquired by the exercise of that spirit, all require to be taken into consideration. It is rare that we find combined in any single case all the ingredients of a salvage service. But we must not therefore lose sight of those which prominently appear from the evidence to command our approval or elicit our commendation. The evidence in this case abundantly shows that there was promptitude, energy and skill displayed by some of the salvors, especially by Captain Snow, the dux facti, the strong prevailing mind that conducted the combined operations of the tow-boats; and in all there seems to have been no want of alacrity or zeal in the discharge of their respective duties. What is particularly to be considered in deciding upon the claim of the tow-boat

company as owners, is the admirable equipment of their boats. They were well manned and provided with the necessary appliances to afford immediate and effective assistance to vessels in distress; and it is doubtless by the application of the extraordinary and powerful steam pump of the Star, that the salvors were enabled to raise the Delphos after she was sunk. If it be important upon principles of public policy and in view of the general interests of navigation, to encourage vessels thus provided and equipped to embark in salvage services, courts of admiralty should not lose sight of the great expense which must necessarily be incurred to keep them always in a state of preparation to afford assistance.

Upon a review of the whole case, I am clearly of opinion that a liberal compensation should be awarded. Property of the value of $50,000 and upwards has been rescued from inevitable destruction by the timely assistance of the tow-boats. All suppositions that it might have been saved through some other agency, are merely speculative, and have no weight with the court. The claimants, however, have rights which must be protected. They have been unfortunate, and the court will not subject them to any further loss which may be inconsistent with a fair and equitable compensation to those through whose means they were saved from a greater calamity. It is the duty of the court to encourage active exertions in salvage cases, but not cupidity. I think that under all the circumstances of the case, forty-five per cent. would be a fair and proper allowance, if all the salvors were before the court. Of this quantum I award the usual one-third to the libelants. I adhere to this proportion for the owners of the property engaged and put at risk in the salvage service, upon the authority of the great case of Mason v. The Blaireau [2 Cranch (6 U. S.) 240], which Mr. Justice Story in most emphatic terms has declared should be the guide for all inferior courts except under very peculiar and extraordinary circumstances. It is therefore ordered, adjudged and decreed that the libelants recover the one-third of forty-five per cent. on the value of the property saved—that is to say, one-fifteenth of the said value, after all expenses are deducted.